Argued at Pendleton May 1, reversed and remanded June 27, rehearing denied July 25, 1922.·

# BEEM v. BEEM.

(207 Pac. 604; 207 Pac. 1094.)

**Divorce—To Wife Warranted for Personal Abuse and Indignities.**

1. Personal abuse and indignities imposed on the wife by the husband *held* to entitle her to a divorce on the ground of cruel and inhuman treatment.

## ON PETITION FOR REHEARING.

**Divorce—Evidence Held not to Afford Grounds for Recrimination.**

2. Evidence considered, and *held* not to show grounds of recrimination, where the reputation of plaintiff, who came of an excellent family, was not questioned by defendant, and plaintiff retained the esteem of her associates.

From Union: J. W. KNOWLES, Judge.

In Banc.

This is a suit for divorce brought by Edythe Beem against Jonathan Beem, her husband. The complaint charges that the defendant was guilty of cruel and inhuman treatment and that he subjected the plaintiff to personal indignities rendering her life burdensome. The defendant answered by denying the charges made against him and by alleging that—

"Whatever acts, if any, done by the defendant to plaintiff, were caused and provoked by the conduct of the plaintiff, and plaintiff is not without fault as alleged in the complaint."

The defendant did not ask for any affirmative relief, but contented himself by merely praying for a dismissal of the suit. A girl child is the fruit of the

---

1. Cruel and inhuman treatment as ground for divorce, see notes in 65 Am. St. Rep. 69; 9 Ann. Cas. 1090; 18 L. R. A. (N. S.) 304; 34 L. R. A. (N. S.) 360.

Habits or course of conduct of spouse as cruelty warranting divorce, see note in Ann. Cas. 1918B, 480, 500.

marriage. The trial occurred on April 27, 1921, and it terminated in a decree of dismissal. The plaintiff appealed.　　REVERSED AND REMANDED.

For appellant there was a brief and oral argument by *Mr. L. Denham.*

For respondent there was a brief and oral argument by *Mr. R. J. Green.*

HARRIS, J.—1. It is our conclusion that the plaintiff is entitled to a divorce. The parties were married on August 31, 1918, at Elgin, Oregon, where they had previously resided. At the time of the marriage she was about 18 and he was about 20 years of age; both came from excellent families; and, as we understand the record, neither party challenges the reputation or standing of the other. Indeed, at the time of the trial, the plaintiff was an officer in a lodge, thus indicating that at that time she had the confidence and esteem of those who knew her best. The defendant testified that the marriage occurred two weeks after the engagement. The defendant says that he knew that the plaintiff was at that time engaged to a young man, whom we shall designate as A, who was then in France with the American Army. The plaintiff denies that she was engaged to A, although she admits that she had been corresponding with him since he had entered the service. The defendant admitted that he was of a jealous disposition.

On September 4th, four days after the marriage, the plaintiff received a letter from A. The evidence does not show when this letter was written, but it is

probable that it was written before the plaintiff and defendant were engaged. The plaintiff says that when she received the letter the defendant applied to her a profane epithet, because she had received the letter, and at the same time made a dire threat against A. The defendant gives a somewhat different version of this incident, but in view of his confession of jealousy and his assertion that he knew that A had been a fiancé of the plaintiff, we are inclined to think that when his wife received the letter he spoke more forcibly and inelegantly than he is now willing to admit. At any rate this incident throws light upon subsequent occurrences.

From time to time the plaintiff and the defendant attended lodges and dances. The plaintiff says that frequently, after they returned home from lodge meetings or dances, he upbraided her for having been too familiar with other men, when she had done nothing except to talk with some men in the lodge-room or to dance with some man at the dance. These happenings standing alone do not seem to us to possess the importance which the plaintiff attaches to them; and yet they tend to explain the general conduct of the defendant.

The plaintiff charges that the defendant stayed out late at nights, frequented pool-halls, and thus neglected her and their child. Although the defendant has asseverated thus: "Every man should have a little rights, and I don't think he ought to be set plumb down on," still he claimed that he did not loaf around the pool-halls a great deal. It is our view that the evidence does not support this accusation of neglect.

The plaintiff also avers that the defendant failed to support her and the child. If we read the record

aright, the defendant supplied his wife and child with
sufficient food and proper clothing, although it is true
that the grandmother, just as most grandmothers do,
did provide some clothing for the child. In truth,
the evidence indicates that all things considered the
defendant provided well in respect of food and cloth-
ing. After A was discharged from the army he re-
turned to Elgin and was married. The date of his
marriage is not given in the record. The plaintiff
on different occasions met A on the streets of Elgin
in view of the public and talked with him. Appar-
ently all those meetings were casual and not prear-
ranged; but whenever the defendant heard of them he
complained to his wife about them.

If the foregoing narrative included the entire story
of the married life of the parties, and if there were
no additional facts we should without hesitation say
that the plaintiff is not entitled to a divorce. But
there are additional facts, important facts, to be con-
sidered.

The plaintiff and the defendant lived in a house in
Elgin, and the plaintiff's mother, Mrs. Dora Hill,
lived in or near Elgin. According to the testimony
of the plaintiff, the defendant told her "to stay away
from" her mother, and "he said he didn't want me
to be around her, and to keep away from her." Mrs.
Dora Hill says that about a month prior to the sep-
aration she told the defendant that she had not made
a certain statement which he, in a conversation with
the plaintiff had attributed to his mother-in-law.
Evidently the explanation attempted to be made by
Mrs. Hill did not satisfy the defendant, for, accord-
ing to the testimony of Mrs. Hill, "he told me to
never step my foot in his house again."

This incident serves to explain the temper subsequently betrayed by the defendant. On March 19, 1920, the defendant returned to Elgin from a logging camp where he had been at work, and upon his return he learned that his wife and child were staying at the home of his mother-in-law. At that time the plaintiff was very much reduced in weight; she then weighed 108 pounds although her normal weight was about 130 pounds. Dr. Kirby, the attending physician, testified that she was in "a run-down condition" and that—

"I just gave her something for her nervous condition; she was all to pieces and up in the air." The baby was also sick. Dr. Kirby explained that "the child at first had tonsilitis, with a temperature of 101 or 102—a sore throat * * and then later it developed into bronchial pneumonia,—a pretty sick little child for a few days." The doctor also stated that "the mother was nervous and sick, and she wasn't able to take care of the baby, at least she did none of it; her mother took care of the baby"; and, furthermore, Dr. Kirby told the plaintiff's mother to take care of the baby. According to the testimony of the plaintiff, the defendant "came down, and wanted me to leave mamma right then, and I had orders to stay there with her,—Dr. Kirby had ordered me not to move her [the baby]. * * She had bronchial pneumonia and tonsilitis; she was very sick."

In other words, the plaintiff went to her mother's home with her child; the plaintiff was not well and her child was very sick; and because of the condition of the child the plaintiff explained to the defendant that she could not take her child and leave her mother's home; and all this put him in an ill humor.

The climax came on April 4, 1920. On that day the defendant appeared at the Hill home in company with his brother Lloyd Beem. The plaintiff testified

that the defendant came to the Hill home and told her that he had sold to his brother the furniture, cow, pigs and chickens; that he had "turned the house over to" his brother; that he told her "to keep out" of the house which had been his and her home; "that he was through with me, and he would never live with me again";. that he cursed her; that he told her mother that the latter ought to kick her out; that while she was crying her mother remonstrated with the defendant because of the abuse he was heaping upon the plaintiff, and thereupon the defendant informed her mother that "he would smash her if she was a man." Mrs. W. C. Hill, a sister of the plaintiff's mother, had been "invited down there for dinner," and she arrived upon the scene when the storm was at its height, and she says that when she "got up to the house" the plaintiff was crying and the defendant "was using awful language." Mrs. W. C. Hill fully corroborated the story told by the plaintiff. Mrs. Dora Hill likewise completely corroborated the plaintiff. Mrs. Dora Hill says that when the defendant stated that he had "turned everything over to" his brother, the plaintiff protested that some of the things belonged to her, and thereupon Mrs. Dora Hill "spoke up and told him that the bedding,—the feather-bed and everything else in the bed line was hers, that I had give it to her"; that the defendant then made a remark about the feather-bed. Without repeating the remark, it is enough to say that "she slammed the door" in his face, just as any self-respecting woman would have done; but notwithstanding this the defendant forced his way into the house and, in the language of one witness, the plaintiff "was on the davenport crying and he stood there bemeaning her about everything." It is true that the

defendant did not admit that he was guilty of this inexcusable conduct, although he was willing to concede: ''I may have said some little thing, that didn't amount to nothing when I was mad.'' It is also true that Lloyd Beem declared that the bill of sale was not exhibited upon that occasion; but it is a significant fact that Lloyd Beem admitted that the bill of sale ''had been made out about that time,'' and that, in his language, ''I think I did'' have the bill of sale at that time. And it is likewise significant that this witness admitted that there was some discussion about the furniture. Viewed in the light of all the circumstances and of what naturally could be expected of one whose mental attitude was like that of the defendant it seems to us that the weak denials of the defendant in respect of the occurrences of April 4th are simply overwhelmed by the testimony of the plaintiff, Mrs. Dora Hill and Mrs. W. C. Hill. During the interval between March 19th and April 4th, the defendant called at different times to see the baby, and upon every occasion, according to the testimony of Mrs. Dora Hill, his visit ended in a row with plaintiff and with the defendant doing the rowing ''principally.'' The plaintiff said, when a witness, ''I have stood it just as long as I can.'' The record narrates numerous facts besides those to which attention has been directed; but it will not be necessary to detail any additional circumstances.

Since April 4, 1920, the parties have been separated. The plaintiff with her baby has lived with her mother, and the defendant has made no pretense of furnishing food or clothing for his wife or child. If the plaintiff is entitled to a divorce, it is because of what happened on or before April 4, 1920; and we think that the facts warrant the court in grant-

ing a decree of divorce as prayed for by the plaintiff. However, we are not persuaded that it would be just to require the defendant to pay alimony, but we do conclude that the plaintiff is entitled to the custody of the child and that the defendant ought to be required to contribute to the maintenance of the child. The record does not contain sufficient information to enable us to determine with any degree of satisfaction what would be a proper amount to be contributed by the defendant for the maintenance of the child; and therefore the cause will be remanded to the Circuit Court with directions to enter a decree divorcing the parties and granting to the plaintiff the custody of the child, reserving, of course, to the defendant the right to visit the child, and, after hearing any evidence that the parties may wish to offer, to fix as the amount to be contributed by the defendant towards the maintenance of the child such sum or sums as may appear to be just.

REVERSED AND REMANDED, WITH DIRECTIONS.

⟨7

Rehearing denied July 25, 1922.

ON PETITION FOR REHEARING.

(207 Pac. 1094.)

REHEARING DENIED.

*Mr. R. J. Green,* for the petition.

*Mr. L. Denham, contra.*

HARRIS, J.—2. In the petition for a rehearing it is asserted that we overlooked the evidence concerning the conduct of the plaintiff occurring subsequent

to April 4, 1920; and it is argued that her conduct after that date was such as to constitute a cause of divorce, and that therefore the plaintiff cannot prevail even though the defendant was guilty of cruelty as charged in the complaint. The rule that divorce is a remedy for the innocent against the guilty is quite generally recognized and has been frequently applied in this jurisdiction: 9 R. C. L. 387; 19 C. J. 93. But, though the rule is conceded, the conclusion urged by the defendant cannot be conceded.

We expressly stated in the original opinion that "if the plaintiff is entitled to a divorce, it is because of what happened on or before April 4, 1920," and, although we did not discuss in detail the evidence relating to occurrences subsequent to April 4, 1920, the date when the defendant was guilty of the brutal and inexcusable conduct narrated in the original opinion, we did not overlook any evidence concerning the conduct of the plaintiff, nor is it necessary now to rehearse the details found in the record, for it is sufficient to say that the plaintiff did nothing which, in the circumstances revealed by the record, could have constituted cause for divorce. As stated in the original opinion, the plaintiff comes from an excellent family and her standing and reputation are not even questioned by the defendant. It is not going far afield to say that if her behavior had been censurable she could not have retained, as she did, the esteem and confidence of the people among whom she has lived. The plaintiff whether in attendance upon meetings or dances or social functions was almost invariably chaperoned by her mother. The petition for a rehearing is denied.

REHEARING DENIED.